Nash, C. J.
 

 Sarah Sloan, by her last will, bequeathed to the plaintiff Fanny a negro woman named Hannah. The bequest is in the following words :
 

 “ It is my will and' desire that, immediately after my death, my son James Slo^ntake into his possession negro woman Hannah, for theúise of my daughter Fanny "West, and dispose of her in Such manner as he thinks best calculated to support the said Fanny "West during her life-time, but in the event of the said Fanny West’s death, the said negro, or her value, is to be divided between the children of the said Fanny West.”
 

 James Sloan, the trustee, took the negro'into his possession, and he, by his will, bequeathed the slaves in question among his children. The defendant E. B. Sloan, is the acting executor of James Sloan, and took into his possession the slaves in controversy, and delivered over to the legatees, under the will of James Sloan, the negroes respectively bequeathed to them, and some he has sold. All the proper parties are before the Court. The bill prays that some suitable person may be appointed trustee for her and her children, and a decree that the defendants deliver over the slaves in their respective possession, being the descendants of Hannah, and for an account, not only of their hires, but of the value of such as have been sold. Fanny West, with her children, removed from the State in 1827, leaving the negro Hannah in the possession of James Sloan. The latter occasionally remitted to her small sums of money, or paid them to her agent. The first of these payments was in 1835; the next in 1836
 
 ;
 
 another in 1838,
 
 *106
 
 and another in 1843. The last was in 1845, and it is admitted that there is still a balance due the plaintiffs. The will of Sarah Sloan is dated in 1825.
 

 The answer of E. B. Sloan admits that his father received the negro Hannah into his possession, under the trust created by the will of Sarah Sloan, but being in delicate health, and having her children, and being satisfied that it would be more to the interest of the plaintiffs to have her sold, as in her present state she could do nothing towards plaintiffs’ support, the trustee caused her and her children to be put up to auction at the most public place in the district, after due notice, when the defendant "Win. M. Stinson purchased the whole of them for $440.
 

 If the sale was a fair and
 
 tona fide
 
 one, the defense is a substantial one. Under the provisions of the will of Sarah Sloan, James Sloan had an unquestionable right to sell Hannah, if he thought it best for the support of Fanny "West, notwithstanding the ulterior limitations to her children. She was the primary object of the testator’s bounty, and had a right to be supported by the slave as far as it would go. The testatrix evidently looked forward to such a result, for after creating a trust, she proceeds,
 
 “
 
 in the event of the death of the said Fanny, the said negro, or her value, shall be equally divided among her children.” Independently of this provision, by the will creating the trust, the trustee had unlimited power over the slave Hannah, and, therefore, in the exercise of his discretion, had a right to sell her and her children for the purpose of executing his trust. But we cannot agree that James Sloan ever did actually sell Hannah and her children. The form certainly was gone through, but the device is too flimsy to deceive any one. Stinson, the pretended purchaser, is the son-in-law of James Sloan. He never paid a cent for the negroes, gave no note to secure the purchase-money, took no bill of sale, and the negroes went from the place of sale to Janies Sloan’s, in whose possession they remained up to the time of his death. To call this a sale is a mere mockery. It is true Stinson swears that he purchased the negroes fairly and
 
 *107
 
 for himself, but his oath cannot avail the defendants under the facts of the case. James Sloan, it is evident, was induced to make the sale, not for the better support and maintenance of the plaintiff and her family. The plaintiff was in great poverty, and mainly dependent upon the labor of Hannah for her support. She removed from the State in 1827. The first remittance of which we have any knowledge, was made in 1835 ; the.next the year following, and then there is a gap of two years, the next payment being in 1838. The payments then ceased until 1843, a lapse of five years, and the next and last in 1845. Thus, after this pretended sale for her greater comfort, he suffers, in the first instance, several years to elapse from her removal, before he makes her any payment, then another lapse of five years. If the object was the better providing for Mrs. "West, and the sale an actual one, why did he not regularly send her the interest of the money? James Sloan acquired the possession of Hannah as a trustee. She was never out of his possession until his death, and her children passed into the possession of his legatees, who, being volunteers, must be held to be trustees for the plaintiffs, of such of the issue of Hannah as are in their respective possessions. "We are satisfied that the slaves were sold to enable the trustee to acquire the property for himself. This is proved by the testimony of Mr. Carroll.
 

 It is said, however, that the plaintiff acquiesced in the sale of Hannah, and dealt with her trustee on that footing. If she did acquiesce in the sale, the trustee, to avail himself of it, must show that, after the breach of trust, he fully and plainly apprised her of it. If, with the full knowledge, she goes on to deal with him in this new capacity, Equity will consider her as having acquiesced in it. Adams’ Equity, 62. The dealing with the trustee in this case is the reception of the interest of $440, the price bid by Stinson at the alleged sale. Where is the evidence that James Sloan ever communicated to the plaintiff the true facts of that transaction ? She was poor and illiterate ; unable to write or to read writing, living in another State, and a feme covert. No doubt he informed
 
 *108
 
 her that he had sold Hannah. She knew that he had the power to do so; and believing everything to have been fairly done, she, from time to time, receives the interest. This is not such a dealing with the trustee as a Court of Equity will look upon as amounting to acquiescence, for a fraud was practiced upon her. The length of time, if it could be applied in. this case, as presumption of payment, abandonment or satisfaction, is not what the statute requires to form a bar, for it was only seven years from the last payment to the filing of the bill.
 

 It is further said, that the plaintiff has conie too late to have an account. It is material in Equity that an account be claimed in a reasonable and proper time.
 

 It is a sufficient reply to this objection that the trust is still open.
 

 Our attention was called to the case of
 
 Davis
 
 v.
 
 Cotten,
 
 2 Jones’ Eq. 430. It differs materially from this. Hoderick Cotten, by his will, after giving several legacies, directed that all the residue of his estate should be divided into two lots, one of which he gave to the children of his son Nichard Cot-ten, and the other he lent to his son S.
 
 W.
 
 Cotten for life, making provisions for its distribution after his death. Among the slaves was one named Lavinia. Mrs. Cotten, the widow, was appointed executrix, and Thomas Snipes, executor, who duly qualified. In 1827, the executors, under an order of the -County Court duly obtained, sold the woman Lavinia and her two children, and Mr. Charles 'Williams purchased them for Mrs. Cotten, into whose possession they returned. The defendants, in their answers, say, that, at February Term, of the County Court of Chatham, Thomas Snipes, the acting executor, made a settlement of his administration of the estate, with commissioners duly appointed, in which he was charged with the value of Lavinia and her children, to wit, the sum for which Williams bid her off. This money was, by Mr. Snipes, paid to the legatees. The bill was filed for a recon-veyance of the interest of the plaintiffs in Lavinia and her children, and the settlement was made, in 1830. The Court say,
 
 *109
 

 “
 
 If the executors bad made no settlement, or bad not paid over the balance, there was an express and unclosed trust, as to which the statute of presumptions does not apply; but if the executors
 
 had dosed %i/p the
 
 business, and the several legatees had received their respective legacies and filial portions, then there was no express trust, but a mere right to have the executrix converted into a trustee in regard to the slave Lavinia and her children, and the statute would apply.” In our case there was no settlement between the parties, and no full payment ; it is, therefore, an open trust.
 

 The plaintiffs are entitled to a decree for a reconveyan ce of the descendants of Hannah, and to the appointment of another trustee, and to an account of the hires of the slaves, and of the value of such as have been sold to purchasers without notice.
 

 There must be a reference to the clerk to take an account; in doing so, he will allow the defendants the several payments, and the expense of such as were a charge in their raising.
 

 This being a proceeding for a fund for the separate use of the plaintiffs, the joining of the husband would have been merely formal. If he was not dead when the bill was filed, we are satisfied he is now dead.
 

 Pee CubiaM. Decree accordingly.